ADAM G. GASNER (SBN 201234)
Law Chambers Building
345 Franklin Street
San Francisco, CA 94102
Telephone:   415-782-6000
Facsimile:   415-782-6011
E-Mail:   adam@gasnerlaw.com

Attorney for Defendant
ELMER ARQUIMIDES RODRIGUEZ

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>      v.<br><br>ELMER ARQUIMIDES RODRIGUEZ,<br><br>           Defendant. | No. 3:19CR00280-013 RS<br><br>ELMER ARQUIMIDES RODRIGUEZ'S SENTENCING MEMORANDUM<br><br>Date: January 9, 2023<br>Time: 9:30 a.m.<br><br>HON. RICHARD SEEBORG |

GASNER CRIMINAL LAW
Law Chambers Building
345 Franklin Street
San Francisco, CA 94102

1

## I. INTRODUCTION

Defendant ELMER ARQUIMIDES RODRIGUEZ ("Mr. Rodriguez"), 34 years old, comes before the Court for sentencing after a jury found him guilty, on June 1, 2023, of the following counts of the 3rd Superceding Indictment (Dkt. 737):

- Count One: conspiring to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d);

- Count Two: murder in aid of racketeering of Jorge Martinez on or about March 17, 2017, in the Northern District of California in violation of 18 U.S.C. §§ 1959(a)(l) and 2;

- Count Three: murder in aid of racketeering of Giovanny Alvarez on or about May 25, 2017, in the Northern District of California in violation of 18 U.S.C. §§ 1959(a)(l) and 2;

- Count Four: attempted murder in aid of racketeering of Justo Elbir on or about November 26, 2017, in the Northern District of California in violation of 18 U.S.C. §§ 1959(a)(5) and 2; and

- Count Five: knowingly using, carrying, brandishing, or discharging a firearm during a crime of violence, or possessing a firearm in furtherance of a crime of violence, in the Northern District of California in violation of 18 U.S.C. §§ 924(c) and 2.

The defense requests the Court adopt the factual recitations in the presentence investigation report ("PSR") (Dkt. 972).

1. The instant convictions

    a. Total offense level:    43

    b. Criminal history category:    III

    c. Guideline range:    Life

    d. Supervised release range:    5 years

    e. Maximum fine:    $50,000.00 to $250,000.00

GASNER CRIMINAL LAW
Law Chambers Building
345 Franklin Street
San Francisco, CA 94102

    f.  Restitution:                      $17,456.06

    g.  Special Assessment:        $500.00

## II.  SENTENCING

As the Court is aware, the advent of *U.S. v. Booker*, 125 U.S. 738 (2005) restored the Court with the power to sentence as it sees fit within the statutory framework of 18 U.S.C. § 3553(a). The restoration of this power gives the Court proper discretion to impose a sentence "sufficient but not greater than necessary" to achieve the purpose of sentencing set forth in 18 U.S.C. §3553(a)(2) after considering the following:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant [§3553(a)(1)];

(2) The need for the sentence imposed [§3553(a)(2)]:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available [§3553(a)(3)];

(4) The advisory – but non-mandatory – Sentencing Guidelines [§3553(a)(4) and (a)(5)];

(5) Any pertinent policy statement;

(6) The need to avoid unwarranted sentencing disparity among defendants with similar records and similar conduct [§3553(a)(6)]; and

(7) The need to provide restitution to any victim of the offense [§3553(a)(7)].

In this case, the Court must choose the minimally sufficient sentence to fulfill the purposes of sentencing based on a consideration of all §3553(a) factors. *Kimbrough v. U.S.,* 128 S.Ct. 558, 570 (2007).

### A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT [§3553(a)(1)]

**The Nature and Circumstances of the Offense:**

The PSR accurately summarizes Mr. Rodriguez's offense behavior adduced at trial in May of 2023. PSR, ¶¶ 54-73.

**The History and Characteristics of the Defendant:**

The following information was gathered in the course of a pretrial defense investigation.

Mr. Rodriguez was born on July 28, 1989, in Usulután, El Salvador. Mr. Rodriguez has two children, a son and a daughter.

Mr. Rodriguez's parents met at his father's house where his mother worked performing household chores. Shortly after his mother became pregnant with Mr. Rodriguez, his father enlisted in the military.

El Molino, the neighborhood where Mr. Rodriguez was raised, was extremely dangerous and permeated by Mara Salvatrucha (MS-13) gang violence. Throughout Mr. Rodriguez's childhood his mother warned Mr. Rodriguez of the dangers of associating with gang members and tried to watch over him as much as she could. If she saw him talking to gang members, she would call out for him. Gang members were rampant and extorted money from residents and local businesspeople using threats and violence.

Mr. Rodriguez was primarily raised by his paternal grandmother with whom he and his mother and sister lived. Mr. Rodriguez's cousins, and his paternal aunt also lived in the home. His grandmother was a homemaker and took care of the children while his mother worked at a local park eatery.

Civil War plagued El Salvador during Mr. Rodriguez's childhood. It was a devastating period for the country and its people. Civilians often stayed indoors to avoid being caught in the crossfire of gun violence or slept under their beds to avoid being hit by stray bullets. The constant sounds of bombs exploding and helicopters hovering overhead throughout the city created a traumatic environment in which to grow up.

In 2001, an earthquake struck El Salvador which caused many deaths and extensive damage to the country, including the home where Mr. Rodriguez and his family lived. The damage caused to the family's home was so extensive they were forced to sleep outside on their patio while their home was reconstructed. With his mother's place of business destroyed she became unemployed, leading to her decision to immigrate to the United States. Mr. Rodriguez was 13 years old when she left for the United States, leaving him in the care of his grandmother.

Mr. Rodriguez did not have a relationship with his father growing up. His mother and father's relationship was short-lived and they separated when Mr. Rodriguez was young. Mr. Rodriguez's father was largely absent and did not provide for him financially. His father never advised Mr. Rodriguez, spent time with him, or taught him any lessons. Mr. Rodriguez's father had other children with two different women. Mr. Rodriguez recalled his father bringing his children along when he visited his mother. Mr. Rodriguez resented how well his father treated and provided for his other children. Mr. Rodriguez would leave the house whenever his father visited.

On a few occasions Mr. Rodriguez confronted his father about his absence and lack of financial assistance but that only provoked an angry response. Despite his father's absence, Mr. Rodriguez denies being emotionally affected by it and feels he had enough love from his mother, grandmother, and paternal uncle, who became a father figure to Mr. Rodriguez.

Mr. Rodriguez's mother was strict and at times aggressive. If Mr. Rodriguez came home past his curfew or did not listen to her rules he was hit with a belt. As a child, Mr. Rodriguez was

5

hit almost daily for misbehaving. Even as an adult, his mother hit him with her hand when she became angry at him.

Mr. Rodriguez's own immigration to the United States consisted of he and 20 other immigrants transported by cars and buses. Along the way Mr. Rodriguez stayed in local motels and obtained three meals a day. The route to Mexico was the most treacherous. He walked two to three hours a day and witnessed several immigrants give up along the way due to exhaustion.

Once he reached Mexico he was transported by car and bus to a border city close to Arizona. From there, he walked in the desert for seven days. Eventually Mr. Rodriguez made his way to Los Angeles where his mother and aunt met him.

Mr. Rodriguez lived with his mother and her boyfriend, with whom he got along, along with ten of the boyfriend's family members in a house in San Francisco. Mr. Rodriguez began working as soon as he was able at his mother's insistence. For 4 years he was employed at A-1 Glass Company (no longer in business) repairing windows which allowed him to help his mother with rent and groceries.

Mr. Rodriguez and his mother got along well although she can be physically aggressive when angry. When they argued, it was usually over Mr. Rodriguez's use of alcohol. Mr. Rodriguez described his move to the United States as very lonely. He did not have friends and was surprised by how quiet the streets were compared to his neighborhood in El Salvador. He felt lost in San Francisco.

Around 2010, Mr. Rodriguez made some friends through playing soccer. He also maintained contact with friends in El Salvador. As he became acclimated to San Francisco, he noticed Norteno and Sureno graffiti around the city. He also heard that many MS-13 members spent time on 20th Street in San Francisco. Mr. Rodriguez was 16 at the time and despite being interested in meeting MS-13 members, he focused on being gainfully employed.

At the age of 22, Mr. Rodriguez had a child with his girlfriend he met through a cousin. Their 3-year relationship ended because she objected to the amount of time Mr. Rodriguez devoted to playing soccer. After their separation, Mr. Rodriguez began taking care of his infant daughter while his ex-girlfriend was at work. Mr. Rodriguez cared for his daughter during her preschool years.

Also at the age of 22, Mr. Rodriguez learned that MS-13 members spent time at Mission Dolores Park in San Francisco. Curious, Mr. Rodriguez went to the park to see for himself. There, he met members dressed in gang attire. The members identified themselves as Surenos and directed Mr. Rodriguez to MS-13 locations where Mr. Rodriguez introduced himself.

Mr. Rodriguez met the mother of his second child, a son, born in 2017. Mr. Rodriguez and his new girlfriend were together from 2014 to 2019, although not physically together for the entire period due to his incarceration. Mr. Rodriguez lived with his girlfriend and her mother at the time of his arrest. His son was only two months old when Mr. Rodriguez was incarcerated.

**B. ARGUMENT**

Having been convicted by the jury of Counts 2 and 3, Murder in Aid of Racketeering, 18 U.S.C. §§1959 (a)(1) and (2), the Court has no choice in sentencing Mr. Rodriguez to anything but a life sentence, that is, a life sentence without any chance of release.

Life without parole "is the second most severe penalty permitted by law." *Harmelin v. Michigan*, 501 U. S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in judgment). In recent years, the Supreme Court has recognized that, although death is different, "life without parole sentences share some characteristics with death sentences that are shared by no other sentences." *Graham v. Florida*, 560 U. S. 48, 69 (2010). "Imprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.'" *Miller v. Alabama*, 567 U. S. 460, 474-475 (2012) (quoting Graham, 560 U.S., at 69).

7

*USA v. Elmer Rodriguez*
No. 3:19CR00280-013 RS
Sentencing Memorandum

Indeed, a life-without-parole sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he will remain in prison for the rest of his days." *Id*., at 70 (internal quotation marks and bracket omitted).

Although the language of 18 U.S.C. §1959 is clear in its mandate, a life sentence without the possibility of parole or release violates the Due Process Clause under the Fifth Amendment, and the Eighth Amendment's prohibition against cruel and unusual punishment. *Cf.*, *Harmelin*, 501 U.S. at 994-995 ("Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout the nation's history. A sentence which is not otherwise cruel and unusual does not become so simply because it is mandatory.").

Here, a sentence of life without possibility of parole or release further violates a defendant's Fifth Amendment rights, in that it directly conflicts with the U.S.S.G. stated sentencing goals: deterrence, incapacitation, just punishment, and *rehabilitation* (emphasis added) *See,* U.S.S.G. Ch.1, Pt. A. The interest of rehabilitation of the criminal is served when the sentence causes the criminal to realize the wrongfulness of his conduct, instills the criminal with a sense of social responsibility, and integrates the criminal into a productive social role. *See, Higdon v. United States*, 627 F.2d 893, 899 (9th Cir. 1980). Moreover, the Supreme Court has long recognized that rehabilitation is one of the main goals of incarceration. *See, Pell v. Procunier*, 417 U.S. 817, 822-23, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974) (identifying four central penalogical objectives as deterrence (by making incarceration undesirable), protection (by quarantining criminal offenders), *rehabilitation*, and ensuring internal security of the prison facility).

**GASNER CRIMINAL LAW**
Law Chambers Building
345 Franklin Street
San Francisco, CA 94102

Obviously, a life sentence without any opportunity for rehabilitation, without any chance of reintegration of a defendant into a productive societal role, violates the sentencing goal of rehabilitation set forth in the sentencing guidelines and recognized by the Supreme Court.

### III.     CONCLUSION:

The defense respectfully urges that the Court give weight to the forgoing in pronouncing sentence.

Dated: December 29, 2023

*/s/ Adam G. Gasner*
ADAM G. GASNER
Attorney for Defendant
ELMER RODRIGUEZ

**GASNER CRIMINAL LAW**
Law Chambers Building
345 Franklin Street
San Francisco, CA 94102

9

*USA v. Elmer Rodriguez*
No. 3:19CR00280-013 RS
Sentencing Memorandum