PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States

MATTHEW M. YELOVICH (NYBN 4897013)
Deputy Chief, Criminal Division

ASEEM PADUKONE (CABN 298812)
ANDREW SCOBLE (CABN 124940)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6401
    FAX: (415) 436-7234
    Aseem.Padukone@usdoj.gov
    Andrew.Scoble@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 19-CR-00280-13 RS |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| ELMER RODRIGUEZ, a/k/a "GORDO" | Sentencing Date: January 9, 2023<br>Time: 9:30 a.m. |
| Defendant. | |

Between 2013 and 2019, the MS-13 20th Street clique committed murders, attempted murders, and violent assaults across the Bay Area, particularly in the Mission District of San Francisco. Elmer Rodriguez, a/k/a "Gordo," led the gang during most of this time. Rodriguez fostered the culture of violence that defined the 20th Street clique.

Rodriguez's VICAR murder convictions are mandatory minimum offenses which require this Court to sentence him to life in prison on those counts. Yet the Court should also sentence him to life in prison on his racketeering charge, and the maximum possible sentences on his

other counts as well.  Rodriguez's lengthy gang tenure, involvement in egregious acts of violence, and unrepentant attitude justify maximum sentences for Rodriguez. Anything less than life in prison for Rodriguez is insufficient to keep the public safe.

### I. Offense Conduct

#### A. Background on the MS-13 20th Street Clique

As set forth in more detail in Probation's Presentence Investigation Report (the "PSR"), the MS-13 20th Street clique claims territory in the Mission District of San Francisco. *See* PSR at ¶ 56. The gang has a leadership hierarchy and its own set of rules. *See id.* at ¶ 55. A main purpose of the clique is to defend its territory from rival gang members. *See id.* at ¶ 56. Clique members seek to maintain control of drug distribution on its turf, and they engage in robbery, extortion, and various violent crimes including murder. *See id.*

#### B. Rodriguez's Role in the Clique

Rodriguez has been the primary leader of the clique for most of the conspiracy period between 2013 to 2019. *See id.* at ¶ 61. He assumed a leadership role shortly after the former leader, his uncle "Caballo," left the country, and became the primary leader after the death of the previous leader, "Spider." RT 2252:10-2253:3; 2263:16-20; 2264:15–2265:25; 944:14-23.

Rodriguez participated in "jumping in" new members of the clique. RT 946:16–947:25; 1367:4 to 1369:12; 435:4–437:3. Under his leadership, Rodriguez and the gang perpetrated multiple stabbings, shootings, and other acts of violence across the Bay Area. Rodriguez frequently directed other clique members to commit murders. *See, e.g.,* RT 1405:1 to 1411:3. He extorted drug dealers in the Tenderloin and stole money and drugs from them. RT 1467:11–1468:16. He also communicated with members of the clique from El Salvador to provide updates about the clique's activities. RT 1386:3–1388:1.

#### C. Rodriguez's Involvement in Specific Acts of Violence

Rodriguez took an active role in ordering other clique members to commit murders after he took control of the clique. He was present for and directly ordered two murders, both of which resulted in convictions.

On March 17, 2017, Rodriguez ordered a gang subordinate to murder Jorge Martinez at Beauty Bar because he believed that Martinez was a Norteño. *See* PSR at ¶ 71. Martinez, who was not affiliated with a gang at the time of the murder, was at the bar with his son and daughter-in-law to celebrate his birthday following a Warriors game. *See id.* Rodriguez's subordinate, Jose Mejia-Carrillo, a/k/a "Niño," shot Martinez twice in the head and neck, which killed Martinez. *See id*.

On May 25, 2017, Rodriguez ordered the murder of Giovanni Alvarez, a/k/a "P Wee," because the gang believed that he had cooperated with law enforcement. *See id.* at ¶ 72. Rodriguez and his subordinate gang members, including Edwin Alvarado Amaya and Kenneth Campos, lured Alvarez into a car and drove him to Bernal Heights Park. *See id*. Rodriguez ordered Alvarado Amaya to hack Alvarez to death. *See id*. Alvarez suffered over 40 deep machete wounds, which the lead investigator described as "the most horrific thing [he had] ever seen" during his 26-year career in law enforcement. *See id*. Rodriguez did not wield the machete but played an integral role in the murder. After Alvarado Amaya had already stabbed Alvarez multiple times, Rodriguez ordered him to go back and finish the job by hacking Alvarez more. *See id*. Rodriguez is then captured on jail call recordings apparently mocking Alvarez and joking about the murder in coded language with fellow gang member and co-defendant Jose Tercero. *See id*.

In addition to the two murders in which Rodriguez was directly involved, he also participated in several attempted murders. On September 16, 2016, Rodriguez ordered other clique members to "hunt" for rival Norteños in their territory. *See id*. at ¶ 64. This hunt culminated with the shooting on 21st & Hampshire Streets, during which a clique member shot a suspected Norteño (who survived). *See id*. A stray bullet from this shooting penetrated the outer walls of an apartment building nearby and shattered a glass shower door. *See id*. ¶ 65.

On November 26, 2017, Rodriguez and other gang members attempted to extort drug dealers in the Tenderloin. *See id*. ¶ 73. The extortion attempt led to a melee after the drug dealers resisted. *See id.* Rodriguez retrieved a shotgun from his car. *See id.* He is depicted in video footage striding towards the melee with the shotgun in hand. *See id*. The victim, J.E., was

shot in the chest by the shotgun from close range. *See id.* Though testimony offered conflicting accounts as to whether Rodriguez ordered the shooting or whether he fired the shotgun himself, the jury convicted Rodriguez for his role in the attempted murder. *See id.*

On November 30, 2017, Rodriguez was driving a car with other gang members when he ordered other gang members to attack R.L., who was waiting by a bus stop on 24th Street and Potrero Avenue. *See id.* at ¶ 68. Rodriguez wrongly suspected that R.L was a Norteño. *See id.* Rodriguez's subordinates brutally stabbed R.L. approximately 15 times, leaving him unconscious and with serious long lasting medical issues. *See id.*

Rodriguez also was involved in several assaults that did not rise to the level of attempted murders. He participated in a March 25, 2015 assault during which he is caught on video punching an individual at Dolores Park. *See id.* at ¶ 66.[1] On October 27, 2016, Rodriguez was involved in the assault of individuals his gang wrongly suspected of being rival gang members outside of the Prita Hotel. *See id.* at ¶ 65. Though he is not caught on video striking any of the victims, he was the leader of the clique at the time and his actions that day demonstrate that he exerted control over the other gang members at the time of the assault. *See id.* On May 17, 2017, Rodriguez and other MS-13 gang members assaulted a man at a taqueria with whom Rodriguez had gotten into an argument. *See id.* at ¶ 67. The gang attacked the man, and Alvarado Amaya even tried to stab the victim but failed to do so. *See id.*

D. Other Murders Committed by the MS-13 20th Street Clique

Rodriguez's influence over the gang contributed to other murders in which he had no direct role. On September 2, 2015, two of Rodriguez's co-defendants murdered a suspected gang rival, German Polanco Gil, on Paul Avenue. *See id.* at ¶ 62. Rodriguez did not directly order this murder, but he was the second-in-command at the time and lauded the shooter for killing a rival gang member. *See id.* at ¶ 63. Rodriguez appears to laugh about the murder in a conversation with an unknown Facebook account on the day after the shooting. *See id.*

---

[1] The PSR lists the date of the assault as March 25, 2017. The assault described in that paragraph actually occurred on March 25, 2015.

Also, gang members including co-defendants Kevin Reyes Melendez and Jose Tercero murdered Gilberto Rodriguez at Gray Whale Cove on February 13, 2018, because they suspected Gilberto of being a Norteño. *See id.* at ¶ 69. Elmer Rodriguez was incarcerated at the time of the murder and only learned about it after the fact, but he bragged about his clique's role in the murder to more senior members of the clique. *See id.* at ¶ 70.

### E. Post-Arrest Conduct

Rodriguez has been in custody since approximately December 2017, when he was arrested by local authorities. Rodriguez's in-custody status did not deter him from continuing his gang activities. For example, Rodriguez ordered another gang member to send drugs to the jail. RT 2437:15-18; Trial Exhibits 77-79. One former member of the clique testified at trial that Rodriguez, while in state custody, had ordered him to check another member's paperwork to verify that he was not cooperating with law enforcement. RT 2264:15 to 2265:25; Trial Exhibits 312-313. Rodriguez also urged a fellow clique member to kill another clique member who he suspected of being a snitch. RT 2440:19–2441:10; RT 2594:10-23.

Rodriguez continued his leadership of the clique even after being moved to Santa Rita Jail following his federal indictment. Rodriguez had "MS" tattooed on his face at some point after being transferred to Santa Rita. RT 579:22–580:2; 2593:12-14. Such a tattoo is only permitted under gang rules if the member has killed someone. RT 2593:5-11. At trial, multiple witnesses testified that Rodriguez continued to lead the clique from the jail and even initiated a new member into the clique over the phone. RT 431:20 to 438:5; 2588:14-19; 2591:3 to 2592:9.

## II. Guidelines Calculation

The government agrees with the Probation Department's calculation of the offense level of 50, which should then be calculated as an offense level of 43. *See* PSR at ¶¶ 82-119. It also agrees that Rodriguez's Criminal History Category is III based on his prior convictions. *See* PSR at ¶¶ 122-124. This results in a guidelines sentence of life in prison.

## III. Section 3553(a) Factors

Elmer Rodriguez led a violent street gang and was involved in multiple murders and attempted murders. He has continued his gang activity even after his arrest in this case. Taking

into account the nature and circumstances of the offense, the history and characteristics of the defendant, the need for a just punishment, deterrence, and protection of the public, the only sufficient sentence for Elmer Rodriguez is life imprisonment.

### A. Nature and Circumstances of the Offenses (§ 3553(a)(1))

Rodriguez personally ordered two murders: the March 17, 2017 Beauty Bar murder of Jorge Martinez and the May 25, 2017 murder of Giovanni Alvarez. He also participated in or ordered at least three other attempted murders: the September 16, 2016 shooting at 21st & Hampshire, the November 26, 2017 Tenderloin shotgun shooting, and the November 30, 2017 stabbing at 24th & Potrero Avenue.

The victims in these cases come from broad cross-sections of the community. Jorge Martinez was not an active gang member at the time of his murder and was at a bar celebrating his birthday with his family after attending a Warriors game. *See* PSR at ¶ 71. Giovanni Alvarez was a fellow 20th Street member who Rodriguez believed (without any evidence) had been snitching to law enforcement. *See* PSR at ¶ 72. Tenderloin shotgun shooting victim J.E. was a drug dealer in the Tenderloin. *See id*. ¶ 73. The victim at 24th & Potrero, R.L., had no gang affiliation and was simply waiting for the bus early in the morning to get to work. *See id*. ¶ 68. The diverse demographics of these victims demonstrate that no one was safe from Rodriguez's indiscriminate acts of violence.

Evidence at trial also demonstrated Rodriguez's cruelty while participating in these acts. For example, he ordered Alvarado Amaya to finish off Alvarez, leading to a crime scene that a 26-year veteran of the San Francisco Police Department described as one of the worst scenes he had investigated in his career. He also mocked his victims after their murders, as demonstrated by his jail calls with Jose Tercero. Only a life sentence does justice given these circumstances.

### B. History and Characteristics of the Defendant

Rodriguez only had two convictions prior to this case, both misdemeanors. *See* PSR at ¶¶ 122-123. Nonetheless, he has a long track record of violence that warrants a significant sentence. Rodriguez, who is currently 34 years old, was older than many of his fellow clique members and assumed a leadership role in the clique. At no point has Rodriguez shown remorse

for his actions. Nor has he shown any interest or ability to rehabilitate. In fact, he has doubled down on his gang leadership by getting MS tattooed on his forehead and assuming a leadership role while in jail. RT 579:22–580:2; 2593:12-14; RT 431:20 to 438:5; 2588:14-19; 2591:3 to 2592:9. Not only has Rodriguez failed to accept responsibility for his actions, he has shown no signs of distancing himself from the gang. He has given the Court no reason to give him a downward variance and sentence him to less than life in prison even on the discretionary racketeering charge.

### C. Protection of the Public and Deterrence

Admittedly, the Court's sentence in this case will do little to deter Rodriguez's gang activity. Rodriguez has demonstrated that he will not hesitate to commit crimes while in custody, and there is no reason to believe that he will stop his gang activities. However, the public will remain better protected with Rodriguez remaining in custody for the rest of his life. While he may still be able to orchestrate acts of violence against specific gang members and rivals while in custody, doing so will be more difficult while in BOP custody. Also importantly, Rodriguez can no longer harm civilians like Jorge Martinez and R.L., who were victimized for being in the wrong place at the wrong time following chance encounters with Rodriguez.

A life sentence is also required because of Rodriguez's role in the gang. As a leader, he orders subordinate gang members to perpetrate acts of violence. A sentence of less than life may be sufficient for certain violent gang members who may age out of the gang life and be less prone to commit acts of violence at an older age. For example, a 55-year-old man would likely have a more difficult time hacking a gang rival to death at Bernal Heights Park than would a 25-year-old. Yet an older age will not stop Rodriguez from doing what he has been doing – ordering younger subordinates to commit murders. His conduct while in custody shows that he has no intention of stepping away from the gang life. And there is little chance that Rodriguez will age out of the gang life given his role in the gang.

Sentencing Rodriguez to life in prison will also achieve the purpose of general deterrence by sending a clear message to other active gang members that their conduct will be met with severe consequences. A life sentence will communicate to active gang leaders that they need not

be the ones to pull the trigger or wield the machete to be met with a hefty sentence. A leader who orders a murder is just as, if not more, culpable than the other perpetrators in a murder. Any sentence they receive will reflect that.

### IV.　Conclusion

Considering all of the 3553(a) sentencing factors, the government respectfully recommends a sentence of life imprisonment on Counts 1-3, a 120 month sentence on Count 4, and an 84-month sentence on Count 5, a five-year term of supervised release, a $500 special assessment, and restitution in the amounts of $17,456.06 to the Polanco Gil family, $9,050 to R.L., and possibly additional amounts to be determined to the Martinez and Alvarez families.[2]

Dated: January 2, 2024

PATRICK D. ROBBINS
Attorney for the United States

/s/
ASEEM PADUKONE
ANDREW SCOBLE
Assistant United States Attorneys

---

[2] The government's victim/witness unit is working with the families to determine whether they have colorable restitution claims, and will inform Probation, the defense, and the Court as soon as possible once it has more information.